MICHAEL POLAK,                    )
                                 )
              Plaintiff,         )
       v.                        )          CIVIL ACTION
                                 )          NO. 12-11197-NMG
RIVERSIDE MARINE                 )
CONSTRUCTION, INC.,              )
                                 )
              Defendant.         )

# REPORT AND RECOMMENDATION ON
# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

April 18, 2014

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, Michael Polak ("Polak"), was employed by the defendant, Riverside

Marine Construction, Inc. ("Riverside"), from August 27, 2009 until approximately

March 1, 2010.  Polak alleges that he was injured on the job on August 31, 2009, when a

piling rolled off the blades of a Bobcat forklift and landed on his foot.  After his employ-

ment with Riverside ended, Polak filed a claim for workers' compensation benefits.

Riverside contested his claim that he was injured.  The parties eventually reached an

agreement, and on July 7, 2011, the State of Maine Workers' Compensation Board issued

a Consent Decree approving the parties' agreement.  While Polak's entitlement to

workers' compensation benefits was premised on his being a land-based rather than a

maritime employee, that issue was never litigated as it was not disputed.

Polak filed his complaint in this court on July 2, 2012, seeking compensation for his injuries under the Jones Act (Count I) and general maritime law (Counts II and III), which provide causes of action for seamen or sea-based maritime employees. Alternatively, Polak is seeking compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b) ("LHWCA"), which authorizes certain land-based maritime workers to bring an action for negligence against an employer in its capacity as the owner of a vessel (Count IV). The matter is before the court on Riverside's Motion for Summary Judgment (Docket No. 13). Therein, Riverside contends that Polak cannot recover under the Jones Act or general maritime law because his claim of seaman status is precluded under the doctrine of res judicata and because the undisputed facts establish that Polak was not a seaman as a matter of law. It also contends that it is entitled to summary judgment with respect to Polak's claim under the LHWCA because there is no evidence that Riverside was acting in its capacity as the owner of a vessel at the time of the plaintiff's alleged injury. Polak contends that the material facts are in dispute, and that each of his claims must be resolved by a jury.

As described below, while the preclusion issues raised by this case have not been decided by the First Circuit, this court finds that res judicata precludes Polak from claiming "seaman" status in this case, and thus defeats Polak's claims under the Jones Act and general maritime law. This court further finds that Polak's claim for negligence under § 905(b) of the LHWCA must fail as a matter of law. Accordingly, and for all the

reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that Riverside's motion for summary judgment be ALLOWED.

## II.  STATEMENT OF FACTS[1]

The defendant, Riverside, is a Maine corporation with a principal place of business in Eliot, Maine.  (DF ¶ 2).  According to its website, Riverside is located on the Piscataqua River in an area "[s]urrounded by the Atlantic Ocean and the many rivers that feed into it," and is engaged in the business of providing "high quality commercial and residential marine transportation and construction to the Maine, New Hampshire and Massachusetts waterfront communities."  (Pl. Ex. 3 at 1).  It specializes "in piers, docks, floats, wharves, pile driving, landscape construction and design, seawalls, dock repairs and dock rebuilds," as well as "in Tug and Barge Services, which include marine towing, boat and barge rentals."  (Id.).  There is no dispute that Riverside owns and/or operates various barges, tugs, and push boats, and that it uses a fleet of vessels in order to carry out its marine transportation and construction operations.  (Pl. Ex. 2 at 14; DF ¶ 23; PR ¶ 23).

The plaintiff, Polak, was employed by Riverside from approximately August 27, 2009 until approximately March 1, 2010.  (DF ¶ 4; PR ¶ 4).  According to Polak, he was

---

[1] Unless otherwise indicated, citations are to the Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment (Docket No. 14) ("DF"); and Plaintiff's Responses thereto ("PR") contained in the Plaintiff's Statement of Disputed Material Facts in Opposition to Defendant's Motion for Summary Judgment (Docket No. 34). Defendant's exhibits (Docket Nos. 15-25) are cited as "Def. Ex.___" and the plaintiff's exhibits (Docket No. 34) are cited as "Pl. Ex.___."

hired to perform work as a "laborer." (Def. Ex. D at 134). As Polak described, he would show up for work at 7:00 a.m. and "[t]hey would say you are going with this guy for the day and jump in a boat and drive a boat down to the job and what have you." (Pl. Ex. 7 at 136). Thus, he would perform whatever work was necessary on a given day. (Id.).

The principal issue raised by the defendant's motion for summary judgment is whether or not Polak qualifies as a seaman or sea-based maritime worker as a matter of law. In addressing that issue, the court must view the facts in the light most favorable to the non-moving party, in this case the plaintiff. PC Interiors, Ltd. v. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011). Applying that standard, the relevant facts relating to Polak's employment are as follows.

## Circumstances Surrounding Polak's Alleged Injury

The alleged injury giving rise to this litigation occurred on August 31, 2009, Polak's second day of employment with Riverside. (DF ¶ 5). On the day of the incident, Polak was working on a materials barge, which had been "spudded," or anchored, approximately 15 feet to 20 feet away from the pier at Riverside's shore side facility. (PR ¶ 5; Pl. Ex. 7 at 165). Riverside was in the process of dismantling a dock as part of what was known as the "Brown project," and the sections of the dismantled dock were on the barge. (PR ¶ 5). Polak was strapping sections of the dock to a sling that was attached to a crane. (Def. Ex. D at 164). The crane, which was operated by one of Riverside's owners, Doug Anderson ("Anderson"), and was secured to a crane barge, would then swing the material over to Kevin Crowley ("Crowley"), who was waiting on the pier.

(Def. Ex. D at 164; Pl. Ex. 7 at 160, 165; see also Pl. Ex. 2 at 43-44).  Once the material reached the pier, Crowley unhooked the load into a flatbed truck that was parked on the pier.  (Def. Ex. D at 164, 169).  He then swung the empty crane back to the materials barge so that it could be re-loaded by Polak.  (Id. at 164).

Riverside's barges, including the materials barge and the crane barge that were used on the Brown project, had no ability to move on their own.  (Pl. Ex 2 at 28; Def. Ex. B ¶ 10; Def. Ex. G ¶ 8).  Consequently, Riverside relied on push boats or tug boats to move the barges into position.  (Def. Ex. B ¶ 10; Def. Ex. G ¶ 8).  During the course of the Brown project, Riverside employees would use push boats to move the crane barge and the materials barge as needed to dismantle various sections of the dock, load the pieces of the dismantled dock onto the materials barge, and return the dismantled sections of dock to Riverside's facility for unloading and disposal.  (See Pl. Ex. 2 at 47-48; Pl. Ex. 7 at 162; Def. Ex. D at 164; PR ¶ 41).  However, once the barges were moved into position, they were spudded off and remained in place while the workers dismantled a particular section of dock at the job site or unloaded the dismantled dock materials back at Riverside's shore side facility.  (See Pl. Ex. 2 at 50-51; Pl. Ex. 7 at 165).

When the dock materials filled up the flatbed truck on the day of Polak's injury, the plaintiff joined Crowley in the truck and the two of them drove to the dump, which was located about three or four miles away.  (Def. Ex. D at 169-70).  The trailer was emptied at the dump, and the two men returned to Riverside's pier.  (Id. at 170).  Back on the pier, as Polak described, he "jump[ed] down on the barge" and started the process

again, with Anderson operating the crane and Crowley remaining on the pier to empty

material from the crane onto the flatbed truck.  (Id.).  According to Polak, he and Crowley

made two or three trips to the dump before he was injured.  (Id. at 169).

After the materials barge was fully unloaded, the next step was to re-load the barge

with materials that were going to be used to build a new dock at the Brown facility.  (PR

¶ 6).  The first materials that needed to be loaded were pilings, which were stacked up on

the left hand side of the pier.  (Pl. Ex. 7 at 171-72).  Each of the pilings was 30 feet long

and weighed 1000 pounds.  (PR ¶ 6).  According to Polak, they were round and

resembled telephone poles.  (PR ¶ 6; Pl. Ex. 6).

In order to load the barge, the pilings first had to be moved using a Bobcat forklift.

(See DF ¶ 6; PR ¶ 6).  Polak was responsible for loading pilings onto the blades of the

forklift, and Anderson was responsible for the forklift's operation.  (Id.).  As Riverside

subsequently reported to OSHA in an Injuries and Illnesses Incident Report, while Polak

was standing on the Riverside pier, his "right foot was struck by a piling that fell from a

forktruck and rolled over his foot."  (Pl. Ex. 5; see also PR ¶ 43).  Polak claims that he

suffered serious injuries as a result of this incident.  (Compl. (Docket No. 1) ¶¶ 5, 8, 12,

15, 18).

### Polak's Return to Work

Polak returned to work on the day following the incident, and was taken by push

boat to the site of the Brown project, where he was asked to cut up tree limbs with a

chainsaw.  (Pl. Ex. 7 at 199).  As he was about to begin working, Polak stepped on a

stone and experienced significant pain in his foot. (Id. at 199-200). He was subsequently taken to the emergency room where he was treated for his injury. (Id. at 196). Polak was able to return to work on light duty, and he spent about two weeks painting and organizing Riverside's office. (Def. Ex. D at 203-04). He was then cleared to return to full duty work without restriction. (Id. at 217; Def. Ex. H).

The plaintiff claims that he worked on various marine contracting jobs for the majority of the time that he worked for Riverside. (PR ¶ 32). For example, in connection with the Brown project, Polak participated in dismantling the dock. (Pl. Ex. 7 at 158). In order to carry out this work, Polak would take the straps from the crane, strap them around a section of the dock, and cut the section of dock free. (Id.). He would then stand on the section that he had just cut off, and ride along as the crane hoisted it up and swung it around to the materials barge. (Id.). Once he reached the materials barge, Polak would step onto the barge, disconnect the section of dock from the crane, and use an aluminum ladder to climb from the barge to the dock, where he would repeat the entire process. (Id.). After the materials barge was loaded, Polak would drive the push boat to push the materials barge back to Riverside's marine facility, or he would stand on top of the barge while another employee operated the push boat, and assist the push boat operator in guiding the materials barge over the water. (See id. at 162). The record indicates that Polak continued to perform work on the Brown project during the months of September 2009 and October 2009. (See Def. Ex. F). Polak claims that over the course of his employment with Riverside, he worked on a number of similar jobs that required him to

perform work aboard the materials barge and in conjunction with the crane barge. (PR ¶ 23; see also Pl. Ex. 7 at 135-36).

During most of his employment with Riverside, Polak recorded the hours he worked on handwritten time sheets, which listed three types of activities: "On Site" work, "Water Transport," and "Yard" work. (See Def. Ex. F; PR ¶ 4). According to Polak's time sheets, during the time period between August 27, 2009 and January 29, 2010, Polak spent 654 out of a total of 772 recorded hours, or about 84.7% of his time, performing "On Site" work for Riverside. (See Def. Ex. F; Pl. Ex. 4). This included work that Polak performed when he was on light duty, as well as land-based construction projects, such as work that Polak performed on a project for what was called Markey's lobster pound. (See Def. Ex. F at 2, 8-12). It also included marine construction work, such as the Brown project, which was performed using the defendant's barges. (See PR ¶ 4; Def. Ex. F). In fact, the time sheets show that Polak worked 120 hours, or 18.35% of his total "On Site" time, performing work at the Brown facility. (See Def. Ex. F at 1-5).

The time sheets also establish that 21 of Polak's recorded hours, or about 2.7% of Polak's time, involved "Water Transport," and that 97 recorded hours, or about 12.5% of his recorded time, involved "Yard" work. (Pl. Ex. 4). According to the plaintiff, water transport consisted of time during which he was transported to or from a job site on a boat or a barge, and yard work consisted of duties that were performed at Riverside's marine facility, including duties that he performed aboard one of the defendant's barges. (See PR ¶ 37; Pl. Ex. 7 at 233).

In addition to his regular job with Riverside, Polak and his father performed welding work on the defendant's new push boat. (Def. Ex. D at 217-19). The welding work occurred at night in the defendant's shop after the ordinary work day was over. (Id. at 217-18). Polak estimated that he worked about four to five hours a night, seven days a week on the welding job, beginning about two months after his injury occurred. (Id. at 219). Riverside paid Polak in cash for this work and did not record it on the company's books. (Id. at 218-19). Accordingly, Polak did not consider it to be part of his regular job duties, and did not record it on his time sheets. (See id. at 217-19).

## Termination of Polak's Employment

Riverside claims that Polak quit his job on March 1, 2010, "approximately five months after returning to full duty employment, and immediately prior to a scheduled drug test." (DF ¶ 12). However, Polak denies that he quit or that his leaving had anything to do with a drug test. (PR ¶ 12; Pl. Ex. 7 at 56). According to the plaintiff, Riverside phased him out by reducing his hours and telling him when he arrived for work that there would not be any work for him that day. (PR ¶ 12). In any event, it is undisputed that after his employment with Riverside ended, Polak filed for unemployment benefits, which Riverside successfully contested. (DF ¶ 13; Def. Ex. C ¶ 5).

## Polak's Workers' Compensation Claim

After Polak's unsuccessful attempt to obtain unemployment benefits, the plaintiff filed a petition for workers' compensation benefits with the Maine Workers' Compensation Board based on the accident of August 31, 2009. (Def. Ex. I). Riverside challenged

Polak's claim of incapacity, and vigorously opposed his petition for benefits.[2]  (DF ¶¶ 15, 16).  Eventually, however, the parties mediated their dispute and were able to reach a settlement under which Riverside agreed to pay the plaintiff certain workers' compensation benefits.  (DF ¶ 17; Def. Ex. M).  On July 7, 2011, the Workers' Compensation Board issued a Consent Decree approving the parties' agreement.  (Id.).

The Consent Decree provided in relevant part that "[t]he Employee sustained a compensable injury to his right foot on August 31, 2009 while working for Riverside Marine Construction."  (Def. Ex. M ¶ 1).  It also contained a provision under which the parties agreed as follows:

> The parties reserve all rights and defenses with respect to future issues, claims, and Petitions regarding the August 31, 2009 date of injury.  Nothing in this agreement shall be construed as a waiver of either party's right to seek additional relief for any future period not addressed in this Decree, to which it/he may be entitled.

(Id. ¶ 10).  As described below, the parties dispute whether the Consent Decree precludes Polak from claiming that he was employed by Riverside as a "seaman" for purposes of this action.  However, there is no dispute that the parties did not affirmatively address the question of Polak's seaman status, or even the question whether Polak was a maritime

---

[2]  In connection with its challenge to Polak's workers' compensation claim, Riverside obtained a surveillance video from July 2010, which shows the plaintiff balancing on the rail of a tugboat as he fishes, running across the back deck of the boat and leaping across the rail to an adjoining vessel, and jumping onto the deck of the adjoining vessel.  (See Def. Exs. K & L). However, the credibility of Polak's claim for damages is not presently before this court, and this evidence will not be considered as it is not relevant to the question whether Polak was employed as a "seaman" at the time he was working for Riverside.

worker, in the context of his claim for workers' compensation benefits, since Riverside did not dispute that Polak was a land-based employee who could qualify for workers' compensation if he had been injured as he alleged.  (PR ¶ 18).

Additional factual details are described below to the extent they are relevant to this court's analysis.

### III.  ANALYSIS

### A.  Summary Judgment Standard of Review

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)).  Accordingly, the burden is upon the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  Id. (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue."  PC Interiors, Ltd., 794 F. Supp. 2d at 275.  "[T]he nonmoving party 'may not rest upon mere

allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  "The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor."  PC Interiors, Ltd., 794 F. Supp. 2d at 275.  "Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law."  Id.

**B.**     **Counts I-III: Claims Under the Jones Act and General Maritime Law**

By his complaint, Polak has asserted a claim against Riverside for negligence under the Jones Act (Count I), as well as claims under general maritime law for unsea-worthiness (Count II) and maintenance and cure (Count III).  Each of these claims is premised upon the plaintiff's alleged status as a "seaman" rather than a land-based mari-time worker.  See Chandris, Inc. v. Latsis, 515 U.S. 347, 354-56, 115 S. Ct. 2172, 2183-84, 132 L. Ed. 2d 314 (1995) (explaining that Jones Act and general maritime law provide remedies for "seamen," whereas LHWCA provides exclusive remedy for land-based maritime workers who do not qualify as seamen).  Riverside argues that the approval of the parties' Consent Decree by the Maine Workers' Compensation Board ("Board") bars Polak's claim of seaman status under principles of res judicata.  It also argues that even if res judicata does not apply, the undisputed facts establish that Polak

-12-

was a land-based employee rather than a seaman throughout his employment with Riverside. Therefore, it contends that it is entitled to judgment as a matter of law with respect to Counts I through III of the plaintiff's complaint. For the reasons described below, this court finds that while the issue of res judicata in this context is complex, the Board's award of workers' compensation benefits under the circumstances of this case bars Polak's present claim that he is a seaman who is entitled to seek relief under the Jones Act and general maritime law. Therefore, this court recommends that Riverside's motion for summary judgment be allowed with respect to these claims. However, to the extent the merits of Polak's status were to be reached, this court would find for the reasons detailed below that the matter would need to be resolved by a finder of fact at trial.

### i.    Res Judicata

Riverside first contends that res judicata precludes Polak from asserting claims in this action that are predicated upon his status as a seaman. (Def. Mem. (Docket No. 26) at 7-11). The defendant's argument is based upon the Board's actions in approving the parties' settlement of Polak's workers' compensation claim. Under Maine law, workers' compensation benefits are not available to "[p]ersons engaged in maritime employment or in interstate or foreign commerce who are within the exclusive jurisdiction of admiralty law or the laws of the United States[.]" 39-A M.R.S.A. § 102(11)(A)(1). Consequently, the defendant argues:

> The Maine Workers' Compensation Board issued a formal Award
> settling the Plaintiff's workers' compensation claim. The Board's
> Award implicitly determined that the Plaintiff was an "employee"
> and therefore not a seaman. The doctrine of *res judicata* bars the
> plaintiff from litigating his status here. Therefore, as a matter of
> law, the Plaintiff is not a seaman and is not entitled to the protections
> afforded seaman under the Jones Act and general maritime law.

(Def. Mem. at 7 (internal citations omitted)). Because this court agrees that the Board, in awarding benefits to the plaintiff under the state workers' compensation scheme, effectively found that Polak was not a seaman for purposes of federal law, this court concludes that Polak is barred from pursuing claims in this action that are premised upon his status as a seaman.

"It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81, 104 S. Ct. 892, 896, 79 L. Ed. 2d 56 (1984). Accordingly, this court must look to Maine law to determine whether the Board's issuance of the Consent Decree precludes Polak's assertion of seaman status in this case. Under Maine law, "[r]es judicata prevents a litigant from splitting the litigant's claim and pursuing it in a piecemeal fashion by asserting in a subsequent lawsuit other grounds of recovery for the same claim that the litigant had a reasonable opportunity to argue in the prior action." Camps Newfound/Owatonna Corp. v. Town of Harrison, 1998 ME 20, ¶ 12, 705 A.2d 1109, 1114 (quotations and citations omitted). In order for the doctrine to apply, "a court must find that: 1) the same parties, or their privies, are involved; 2) a valid final judgment was entered in the prior

action; and 3) the matters presented for decision were, or might have been, litigated in the prior action." Dep't of Human Servs. v. Richardson, 621 A.2d 855, 856 (Me. 1993). This court finds that each of these requirements has been met in the instant case.

### Application of Res Judicata to the Present Case

There is no dispute that the first two elements of the test for res judicata have been satisfied here. The record demonstrates that Polak and Riverside, the parties to the present litigation, are identical to the parties involved in the dispute over Polak's claim for workers' compensation benefits. In addition, the Supreme Judicial Court of Maine has held that "an approved agreement for [workers'] compensation has the force of a final adjudication to the extent of the facts agreed upon and the conditions considered by the parties as a basis for the compensation to be paid." Dufault v. Midland-Ross of Canada, Ltd., 380 A.2d 200, 205 (Me. 1977). Accordingly, the Board's approval of the Consent Decree, under which the parties agreed that Polak "sustained a compensable injury to his right foot on August 31, 2009 while working for Riverside[,]" constitutes a final adjudication of Polak's right to workers' compensation under the Maine Workers' Compensation Act for the same injury that is at issue in this case. See Kalesnick v. Seacoast Ocean Servs., Inc., 866 F. Supp. 36, 37 (D. Me. 1994) (concluding that approval of an agreement for compensation by the Maine Workers' Compensation Board "is a final adjudication" under Maine law).

With respect to the third requirement of the test for res judicata, Riverside urges this court to adopt the reasoning of the court in Kalesnick. In that case, the United States

District Court for the District of Maine determined that res judicata barred the plaintiff's lawsuit against his employer for damages under the Jones Act and other federal maritime laws under facts virtually identical to those presented here. Kalesnick, 866 F. Supp. at 37. As in this matter, the Board had approved an agreement between the parties under which the employer had agreed to pay benefits to the plaintiff under the Maine Workers' Compensation Act. Id. The court found that the Board's approval concerning the payment of benefits constituted an "implicit[ ] conclu[sion] that [the plaintiff] was *not* a Jones Act seaman or maritime worker entitled to federal benefits." Kalesnick, 866 F. Supp. at 39. It also found that the circumstances of the case met the criteria for the application of res judicata because the parties to the workers' compensation dispute were identical to the parties in the Jones Act litigation, the Board's approval constituted "a valid final adjudication" under Maine law, and "[the plaintiff's] status as a nonmaritime employee could have been litigated – indeed was implicit – in the earlier determination approving benefits under the Maine Workers' Compensation Act." Id. at 38. Accordingly, the court concluded that the plaintiff was precluded from pursuing claims under the Jones Act and federal maritime laws. Id. at 37.

This court finds the Kalesnick court's analysis persuasive.[3]  As the court explained in language that is equally applicable to this case:

> Although the parties may never have discussed the details of Kalesnick's eligibility under the Maine Act, the conclusion is unavoidable that seeking Board approval was an assertion of eligibility.  Maine Workers' Compensation benefits are available only to an "employee" as defined under the statute.  The definition *excludes* "[p]ersons engaged in maritime employment or in interstate or foreign commerce who are within the exclusive jurisdiction of admiralty law or the laws of the United States."  39-A M.R.S.A. § 102(11)(A)(1) (mirroring the definition of exclusive federal jurisdiction in *Southern Pac. Co. v. Jensen*, 244 U.S. 205, 218, 37 S.Ct. 524, 530, 61 L.Ed. 1086 (1917)).  Thus the Board approval is implicitly a conclusive determination that Kalesnick is not within the exclusion.

Id. at 38.  For the same reasons, the Board's issuance of the Consent Decree between Polak and Riverside constitutes an implicit conclusion that Polak "was *not* a Jones Act seaman or maritime worker entitled to federal benefits."  Id. at 39.  In particular, the Board's determination that Polak was an "Employee" who "sustained a compensable injury to his right foot on August 31, 2009 while working for Riverside" amounted to a finding that the plaintiff was eligible for workers' compensation and was therefore not a

---

[3]  Following the issuance of its ruling, the Kalesnick court vacated the judgment "as to Count IV" on its own motion pursuant to Fed. R. Civ. P. 60(a).  See Kalesnick v. Seacoast Ocean Servs., Inc., No. CIV. 94-45-P-H, 1994 WL 588573 (D. Me. Sept. 27, 1994).  That Rule authorizes the court to "correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment order, or other part of the record."  Fed. R. Civ. P. 60(a).  Given that the decision to vacate only pertained to one Count, and appears to have been triggered by a minor mistake, it appears that the court's ruling in that case remains good law.  Moreover, this court finds the Kalesnick court's reasoning to be persuasive and supported by the relevant authority.

"person[ ] engaged in maritime employment" under federal statutory law.  (See Def. Ex.

M ¶ 1; 39-A M.R.S.A. § 102(11)(A)(1)).

Even assuming, arguendo, that the Board's issuance of the Consent Decree did not

constitute an implicit conclusion that Polak was not a Jones Act seaman or a maritime

worker, the doctrine of res judicata still applies if "the matters presented for decision . . .

might have been litigated in the prior action."  Kalesnick, 866 F. Supp. at 38 (citing

Richardson, 621 A.2d at 856).  Under Maine law, the Board has authority to consider

whether or not an employee seeking workers' compensation is a seaman who falls within

the exclusive jurisdiction of the Jones Act.  See Dorr v. Maine Mar. Acad., 670 A.2d 930,

931-32 (Me. 1996) (conducting de novo review of Board's determination that plaintiff

"fell within the exclusive jurisdiction of the Jones Act," and was therefore "not an

employee protected by the [Maine] Workers' Compensation Act").  Therefore, the ques-

tion of Polak's seaman status could have been litigated in connection with his claim for

benefits under the Workers' Compensation Act.  Because all three requirements of the

test for res judicata have been satisfied in the instant case, this court finds that summary

judgment should be granted to Riverside with respect to Counts I through III of Polak's

complaint.

### Federal Case Law

The plaintiff argues that the Supreme Court's decision in Southwest Marine, Inc.

v. Gizoni, 502 U.S. 81, 112 S. Ct. 486, 116 L. Ed. 2d 405 (1991), compels a different

conclusion.  This court disagrees for the reasons that follow.

In <u>Gizoni</u>, the Supreme Court was asked to decide, in pertinent part, whether the

plaintiff, a rigging foreman who did work on floating platforms, could maintain a Jones

Act claim based on his status as a seaman even though he had received federal workers'

compensation benefits under the LHWCA. <u>See</u> <u>Gizoni</u>, 502 U.S. at 91, 112 S. Ct. at 493.

The fact that the plaintiff had received such benefits was significant because the LHCWA

excludes coverage for any employee who is "a 'member of a crew of any vessel,' a phrase

that is a 'refinement' of the term 'seaman' in the Jones Act." <u>Id.</u> at 87, 112 S. Ct. at 491

(quoting <u>McDermott Int'l, Inc. v. Wilander</u>, 498 U.S. 337, 349, 111 S. Ct. 807, 814, 112

L. Ed. 2d 866 (1991)). Thus, the plaintiff's assertion of seaman status was inconsistent

with his receipt of benefits for land-based workers under the LHWCA. Notwithstanding

the apparent discrepancy, the Supreme Court held that the plaintiff's receipt of benefits

under the LHWCA did not preclude his subsequent litigation under the Jones Act. <u>Id.</u> at

91, 112 S. Ct. at 493. As the court explained in support of its conclusion:

> It is by now "universally accepted" that an employee who receives
> voluntary payments under the LHWCA without a formal award is
> not barred from subsequently seeking relief under the Jones Act.
> <u>This is so, quite obviously, because the question of coverage has</u>
> <u>never actually been litigated. Moreover, the LHWCA clearly does</u>
> <u>not comprehend such a preclusive effect, as it specifically provides</u>
> <u>that any amounts paid to an employee for the same injury, disability,</u>
> <u>or death pursuant to the Jones Act shall be credited against any</u>
> <u>liability imposed by the LHWCA.</u>

<u>Gizoni</u>, 502 U.S. at 91-92, 112 S. Ct. at 493-94 (emphasis added) (internal citations

omitted). The Court further stated in a footnote addressing an equitable estoppel

argument that had been raised in an amicus brief, "[w]here full compensation credit

removes the threat of double recovery, the critical element of detrimental reliance does not appear.  Argument by *amicus* would force injured maritime workers to an election of remedies we do not believe Congress to have intended."  <u>Id.</u> at 92 n.5, 112 S. Ct. at 494 n.5 (citations omitted).

Polak contends, based on the Supreme Court's language in <u>Gizoni</u>, that his receipt of workers' compensation benefits should not bar his claims under the Jones Act and general maritime law.  (<u>See</u> Pl. Opp. Mem. (Docket No. 33) at 12-14).  In particular, he argues that the question whether he was a land-based worker or a seaman was never litigated before the Board.  (<u>Id.</u> at 13).  He also argues that Riverside's "compensation carrier can recover all of the amounts it has paid pursuant to Title 39-A, Sec. 107 of the Maine Worker's Compensation Act."  (<u>Id.</u>).  Moreover, the plaintiff notes that after <u>Gizoni</u>, cases from other jurisdictions have found that the receipt of workers' compensation benefits does not preclude a plaintiff from seeking recovery from an employer pursuant to the Jones Act.  (<u>Id.</u>).

This court finds that plaintiff's arguments are unconvincing.  As an initial matter, unlike <u>Gizoni</u>, this is not a case in which the employee merely sought workers' compensation benefits or received voluntary payments without a formal award.  Here, Polak was advised by counsel in connection with the workers' compensation matter.  The defendant affirmatively contested those coverage issues that were in dispute under the Workers' Compensation Act (i.e., whether the plaintiff was injured).  The plaintiff had the opportunity to raise other issues that were significant, and could have raised the issue of his

status as an employee.  Instead, Polak affirmatively solicited and then acquiesced in the Board's approval of the Consent Decree, which was a final adjudication of eligibility for workers' compensation under Maine law and thus a determination that Polak was not a person engaged in maritime employment for purposes of federal law.  He concurred with the language of the Consent Decree that he had "sustained a compensable injury."  (See Def. Ex. M ¶ 1).  Under such circumstances, Polak should be barred from asserting claims in this court based on his alleged status as a seaman.  Other courts have reached the same conclusion under comparable facts.  See Sharp v. Johnson Bros. Corp., 973 F.2d 423, 426 (5th Cir. 1992) (finding that formal award of compensation under the LHWCA precluded plaintiff from bringing a Jones Act suit for the same injuries where plaintiff "availed himself of the statutory machinery to bargain for an award, and he had the full opportunity to argue for (or against) coverage"); Vilanova v. United States, 851 F.2d 1, 5-6 (1st Cir. 1988) (finding that while acceptance of voluntary payments under the LHWCA does not bar later suit under the Federal Tort Claims Act, plaintiff's acquies-cence in formal settlement approved by Deputy Commissioner of Labor precluded plaintiff's claim); Kalesnick, 866 F. Supp. at 38 (distinguishing Gizoni from the "case where there was a contest and an official approval by the Maine Workers' Compensation Board that, according to Maine law, was a final adjudication of eligibility").

This court also finds that the plaintiff's attempt to compare Section 107 of the Maine Workers' Compensation Act to the setoff provisions of the LHWCA is without merit. Section 107 of the Maine Act addresses recovery against third persons, and it

allows an employer (or its compensation carrier) who has paid workers' compensation benefits to an employee to "either seek subrogation from the third party tortfeasor through common law remedies or place a lien for the amount of compensation the employee received against the judgment the injured party received" from the third party. Degen-Hogan v. Bourdon, 324 F. Supp. 2d 50, 51 (D. Me. 2004) (quoting Fowler v. Boise Cascade Corp., 948 F.2d 49, 59 (1st Cir. 1991)). As the Maine Supreme Judicial Court has explained,

> [Section 107] provides, among other things, that if the compensation beneficiary recovers damages from a third person, the employer or compensation insurer is entitled to a lien on any proceeds recovered, equal to compensation benefits paid less a proportionate share of the costs of recovery. Section [107] also provides, alternatively, for subrogation of the carrier to the rights of the employee to the extent the carrier has paid him compensation.

Id. (quoting Connell v. Aetna Life & Casualty Co., 436 A.2d 408, 409 (Me. 1981)) (footnote omitted; alterations in original). Significantly, however, Section 107, unlike the LHWCA, does not rectify the situation where an employee obtains double recovery by first obtaining workers' compensation benefits and later seeking additional amounts pursuant to the Jones Act and general maritime law by way of a set-off. See 39-A M.R.S.A. § 107. Therefore, Polak has not shown that the Maine Workers' Compensation Act provides the protection afforded to employers under the LHWCA. See Gizoni, 502 U.S. at 92 n.5, 112 S. Ct. at 495 n.5. Nor has he shown that the Maine Act, unlike the LHWCA, "clearly does not comprehend . . . a preclusive effect[.]" Gizoni, 502 U.S. at 91, 112 S. Ct. at 494.

Polak's argument that he should not be precluded from asserting claims as a

seaman in this case because the issue of his status was not actually litigated in connection

with the workers' compensation matter presents a closer question. In the wake of Gizoni,

some federal courts, in particular the Ninth Circuit Court of Appeals, have indicated that

an employee who receives compensation under the LHWCA is not precluded from

asserting a Jones Act claim against his employer for damages arising out of the same

injury where "the jurisdictional issue was not previously litigated, and no finding in that

regard was made at the administrative level." Figueroa v. Campbell Indus., 45 F.3d 311,

315 (9th Cir. 1995). Cf. Anders v. Ormet Corp., 874 F. Supp. 738, 741 (M.D. La. 1994)

(holding that plaintiff was collaterally estopped from litigating his status as a seaman

under the Jones Act where the parties "fully litigated the issue of seaman status" before

an Administrative Law Judge ("ALJ") at the United States Department of Labor

("DOL")). On the other hand, the Fifth Circuit has rejected the suggestion that LHWCA

coverage must be litigated in an adversarial proceeding in order for a formal award of

compensation to preclude a plaintiff from seeking recovery from an employer under the

Jones Act. See Sharp, 973 F.2d at 426. Thus, courts that have considered the issue are

divided on how to apply the Supreme Court's decision in Gizoni under the LHWCA.

Other than Kalesnick, the parties in this matter have not cited any cases, and none

have been found, addressing the preclusive affect of obtaining a formal award of workers'

compensation under a statutory scheme comparable to the Maine Workers' Compensation

Act. As noted above, Kalesnick compels the conclusion that Polak's claims here cannot

continue. Even in Figueroa, where the Ninth Circuit allowed a Jones Act claim to proceed after a claimant had received LHWCA benefits and there had not been an express finding of eligibility, the court relied on the fact that the statutory schemes of the LHWCA and the Jones Act enabled certain employees to qualify for benefits under both statutes but barred double recovery due to the presence of the off-set provision. Figueroa, 45 F.3d at 315-16. No comparable situation exists in the case of Maine workers' compensation benefits and Jones Act claims.

Moreover, this court finds that the Fifth Circuit's analysis is more persuasive than Figueroa given the specific circumstances presented in the present lawsuit. In Sharp the plaintiff, who was injured while performing bridge repair work for his employer, filed a claim for compensation under the LHWCA and a suit for damages against his employer under the Jones Act. Sharp, 973 F.2d at 424. The parties later reached a settlement of the plaintiff's claim under the LHWCA, which was approved by an ALJ at the DOL. Id. Nevertheless, Sharp continued to pursue his Jones Act claim, and the district court ultimately granted summary judgment for the defendant based on the parties' settlement. Id. at 424-25. On appeal, the Fifth Circuit held that the settlement agreement constituted a "formal award" under Gizoni that precluded the plaintiff from bringing a Jones Act suit arising out of the same injuries. Id. at 426.

In connection with its decision in Sharp, the Fifth Circuit specifically considered the fact that coverage under the LHWCA had never been litigated in an adversarial

proceeding.  Id.  However, it rejected the plaintiff's assertion that he should be permitted

to pursue his Jones Act claim under such circumstances.  As the court determined:

> It is true that LHWCA coverage was never litigated in an adversarial
> proceeding.  But Sharp availed himself of the statutory machinery to
> bargain for an award, and he had the full opportunity to argue for (or
> against) coverage.  He filed a claim for LHWCA benefits, invoking
> the jurisdiction of the DOL.  Pursuant to 33 U.S.C. § 908(i)(1), the
> ALJ considered Sharp's testimony, as well as the parties'
> stipulations and their settlement, before issuing its findings of fact
> and order extinguishing [the employer's] and [the insurance
> carrier's] liability for LHWCA benefits.
>
> Having obtained the order of the ALJ and the aegis of the DOL to
> ratify and enforce his settlement, Sharp ensured that his rights were
> more secure under the agreement than they would have been if the
> settlement were considered merely a contract between the parties.  It
> follows that where the ALJ issues a compensation order ratifying a
> settlement agreement, a "formal award" should be deemed to have
> been made under *Gizoni*, and the injured party no longer may bring a
> Jones Act suit for the same injuries.

Id. (footnote omitted).

Similarly, the plaintiff in this case availed himself of the state's statutory

machinery to bargain for an award of workers' compensation, which he had the full

opportunity, with the assistance of counsel, to argue for or against.  He also sought and

obtained a Consent Decree from the Board approving and enforcing his settlement with

Riverside.  Therein, the Board effectively determined that Polak was an "Employee" who

had "sustained a compensable injury" under the Workers' Compensation Act.  (Def. Ex.

M ¶ 1).  As in Sharp, the formal approval of the parties' settlement ensured that the

plaintiff's rights were more secure than they would have been if he had merely entered

into an ordinary settlement agreement with the defendant. Under <u>Sharp</u>, therefore, Polak should be barred from pursuing claims as a seaman in federal court based on the same injury.

Finally, this court finds that Fifth Circuit's reasoning is particularly compelling in the instant case because Polak claimed benefits under a statutory scheme that specifically excluded coverage for persons engaged in maritime employment who fall within the exclusive jurisdiction of the laws of the United States. By doing so, he effectively took the position that he was not a Jones Act seaman, a position that was ratified by the Board's issuance of a Consent Decree confirming his eligibility for benefits under the Maine workers' compensation law. Because Riverside did not contend that Polak fell within the exclusion for maritime workers, there was no reason for the parties to litigate the issue of his seaman status. Indeed, the fact that Polak did not file his complaint in this case until July 2, 2012, nearly a year after the Board approved the parties' Consent Decree, meant that Riverside had no indication that Polak's status may have been in question at any point that was relevant to the workers' compensation dispute. (<u>See</u> Def. Ex. M; Compl.). Under the circumstances presented here, Polak should be barred from pursuing claims as a seaman notwithstanding the fact that the issue was not previously litigated and no explicit finding was made by the Board regarding his alleged status as a seaman.

This conclusion is consistent with the First Circuit's decision in <u>Vilanova v. United States</u>, 851 F.2d 1 (1st Cir. 1988). <u>Vilanova</u> is not controlling here, since it

addresses whether an employee can bring a suit under the Federal Torts Claim Act ("FTCA") after receiving benefits under the LHWCA, and was decided before <u>Gizoni</u>. Nevertheless, the court's analysis in that case is instructive. Significantly, the First Circuit found that merely applying for workers' compensation benefits under the LHWCA did not preclude the plaintiff from suing his employer under the FTCA. However, it also found that by entering into a settlement of his claim, which was premised upon the ALJ's finding that the plaintiff's injuries were compensable and arose out of and in the course of his employment, the plaintiff was estopped from asserting an FTCA claim against his employer. <u>Id.</u> at 3. In support of this conclusion, the court recognized that the workers' compensation benefits were "a substitute rather than a supplement for FTCA actions" and that employees did not have "a choice between LHWCA compensation and an FTCA suit[.]" <u>Id.</u> at 4. It further recognized that the statutory scheme was not "intended to give injured workers two chances to maximize their compensation award." <u>Id.</u> Similarly, in the instant case, compensation under the Maine workers' compensation scheme is not a supplement for Jones Act benefits.[4] Polak is similarly estopped from pursing his Jones Act claim.

**<u>Reservation of Rights</u>**

---

[4] In <u>Vilanova</u>, the Nonappropriated Fund Instrumentalities Act provided that LHWCA compensation constituted "the exclusive remedy against [the] United States" for injuries arising out of and in the course of a worker's employment. <u>See</u> <u>Vilanova</u>, 851 F.2d at 2. While the Maine Workers' Compensation Act does not contain such explicit language, it specifically excludes coverage for maritime workers who fall "within the exclusive jurisdiction of admiralty law or the laws of the United States[.]" 39-A M.R.S.A. § 102(11)(A)(1).

The plaintiff also argues that he should be allowed to pursue a Jones Act claim based on language in the Consent Decree under which the parties agreed to reserve their rights "with respect to future issues, claims, and Petitions regarding the August 31, 2009 date of injury." (Pl. Opp. Mem. at 13 (quoting Def. Ex. M ¶ 10)). This court disagrees that this language authorizes the plaintiff to pursue claims reserved for seamen under the Jones Act and general maritime law. To be sure, res judicata can be avoided where "[t]he parties have agreed in terms or in effect that the plaintiff may split his claim, or the defendant has acquiesced therein[.]" Restatement (Second) of Judgments § 26(1)(a). It also may be avoided where "[t]he court in the first action has expressly reserved the plaintiff's right to maintain the second action[.]" Id. § 26(1)(b). Here, however, the parties' reservation of rights cannot be construed as an agreement allowing Polak to pursue federal maritime claims premised on his status as a seaman. Nor can the Consent Decree be interpreted as an express reservation by the Board to reserve Polak's right to maintain such a claim. Polak's allegation that he is seaman or maritime worker is entirely at odds with the plaintiff's assertion of eligibility under the Workers' Compensation Act. It is also directly inconsistent with the Board's finding that Polak "sustained a compensable injury to his right foot on August 31, 2009," and with its implicit conclusion that Polak did not fall within the exclusion for federal maritime workers and was not a Jones Act seaman entitled to benefits under federal law. (See Def. Ex. M ¶ 1). The only reasonable interpretation of the reservation of rights language on which the plaintiff relies is that the parties' agreement did not preclude Polak from seeking additional compen-

sation for his August 31, 2009 injury in his capacity as a land-based worker under the

Workers' Compensation Act.  Therefore, Riverside's motion for summary judgment

should be allowed with respect to Counts I through III.

### ii.    Merits of Polak's Claim of "Seaman" Status

The defendant also argues that it is entitled to summary judgment on Counts I

through III because the factual record demonstrates that Polak was a land-based employee

rather than a "seaman" within the meaning of the Jones Act and the general maritime

laws.  (Def. Mem. at 5-6, 11-15).  While this court finds that res judicata bars these

claims, given the somewhat unsettled nature of the case law following <u>Gizoni</u>, this court

will address Riverside's contention that Polak's claim of seaman status must fail for this

reason as well.  The Supreme Court has emphasized that "[t]he seaman inquiry is a mixed

question of law and fact, and it often will be inappropriate to take the question from the

jury." <u>Harbor Tug & Barge Co. v. Papai</u>, 520 U.S. 548, 554, 117 S. Ct. 1535, 1540, 137

L. Ed. 2d 800 (1997).  Accordingly, summary judgment should not be granted unless "the

facts and the law will reasonably support only one conclusion." <u>Wilander</u>, 498 U.S. at

356, 111 S. Ct. at 818.  Because this court finds that Polak has presented sufficient

evidence to create a genuine dispute as to whether he was employed by Riverside as a

"seaman," this court concludes that Polak's status cannot be resolved on summary

judgment.

### The Test for Seaman Status

The Jones Act provides in relevant part that "[a] seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C. § 30104. "The issue of what constitutes a 'seaman' under this provision has been the subject of considerable litigation." Dean v. McKie Co., 771 F. Supp. 466, 470 (D. Mass. 1991). However, Supreme Court cases have established certain principles that provide guidance in defining what is meant by a Jones Act "seaman." For example, the Court has explained that "[w]hether under the Jones Act or general maritime law, seamen do not include land-based workers." Chandris, 515 U.S. at 358, 115 S. Ct. at 2185 (quoting Wilander, 498 U.S. at 348, 111 S. Ct. at 814). In order to prevail on such claims, therefore, maritime workers must establish that they "owe their allegiance to a vessel and not solely to a land-based employer[.]" Id. at 359, 115 S. Ct. at 2185 (quoting Wilander, 498 U.S. at 347, 111 S. Ct. at 813). The case law also emphasizes that coverage under the Jones Act, like the jurisdiction of admiralty over claims for maintenance and cure, "depends not on the place where the injury is inflicted but on the nature of the service and its relationship to the operation of the vessel plying in navigable waters." Id. at 360, 115 S. Ct. at 2186 (quoting O'Donnell v. Great Lakes Dredge & Dock Co., 318 U.S. 36, 42-43, 63 S. Ct. 488, 492, 87 L. Ed. 596 (1943)). As the Supreme Court has explained, "the Jones Act inquiry is fundamentally status based: Land-based maritime workers do not become seamen because they happen to be working on board a vessel when they are injured, and seamen do not lose Jones Act protection

when the course of their service to a vessel takes them ashore." Id. at 361, 115 S. Ct. at

2186. Thus, "[i]n evaluating the employment-related connection of a maritime worker to

a vessel in navigation," courts are instructed not to "employ a 'snapshot' test for seaman

status" by "inspecting only the situation as it exists at the instant of injury[.]" Id. at 363,

115 S. Ct. at 2187 (quotations and citation omitted). Instead, courts must bear in mind

that "a more enduring relationship is contemplated in the jurisprudence." Id. (quotations

and citation omitted).

In light of these principles, the Supreme Court in Chandris articulated a two-part

test that sets out the requirements for seaman status. As the Court held in pertinent part:

> [T]he essential requirements for seaman status are twofold. First ...
> an employee's duties must contribute to the function of the vessel or
> to the accomplishment of its mission.... Second, and most important
> for our purposes here, a seaman must have a connection to a vessel
> in navigation (or to an identifiable group of such vessels) that is
> substantial in terms of both its duration and its nature.

Id. at 368, 115 S. Ct. at 2190 (quotations and citations omitted). The Court further

explained that the first prong of the test "is very broad" and makes "[a]ll who work at sea

in the service of a ship . . . eligible for seaman status." Id. (quotations, citation and

emphasis omitted). Accordingly, in order to satisfy this element, "[i]t is not necessary

that a seaman aid in navigation or contribute to the transportation of the vessel, but a

seaman must be doing the ship's work." Wilander, 498 U.S. at 355, 111 S. Ct. at 817.

With respect to the second, or substantial connection prong of the test, the

Chandris Court emphasized that the "fundamental purpose" of this requirement is "to

separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." Chandris, 515 U.S. at 368, 115 S. Ct. at 2190.  Accordingly, the "the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea." Papai, 520 U.S. at 555, 117 S. Ct. at 1540.  With respect to the duration requirement of the substantial connection test, the Supreme Court found that "[a] maritime worker who spends only a small fraction of his working time on board a vessel is fundamentally land based and therefore not a member of the vessel's crew, regardless of what his duties are."  Chandris, 515 U.S. at 371, 115 S. Ct. at 2191. It also adopted a general rule under which an employee "who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act."  Id.  However, the Court emphasized that this rule is nothing more than "a guideline" and that the question of seaman status in any given case "will depend on the nature of the vessel and the employee's precise relation to it."  Id. (quotations and citation omitted)

In evaluating the nature and duration of an employee's connection to a vessel or group of vessels in a particular case, "the total circumstances of an individual's employment must be weighed to determine whether he had a sufficient relation to the navigation of vessels and the perils attendant thereon."  Id. at 370, 115 S. Ct. at 2190 (quotations and citation omitted).  "It is only when the employee's job assignment

becomes permanently changed during the course of his employment that the employee is entitled to have the question of the 'substantiality' of his vessel-related work assessed on the basis of a particular time period rather than on an assessment of the entire term of employment by that employer." Dean, 771 F. Supp. at 471. Here, the record shows that after a brief period of light duty work, Polak returned to full duty work without restriction and proceeded to carry out the duties that he had been hired to perform prior to his alleged injury. (See Def. Ex. D at 217; Def. Ex. H). Thus, although the incident giving rise to the plaintiff's claims occurred on his second day of employment, his status must be considered in the context of his employment with Riverside as a whole. See Grab v. Boh Bros. Constr. Co., L.L.C., 506 Fed. Appx. 271, 277 (5th Cir. 2013) (unpub. op.) ("Although [plaintiff] was injured on his first day of work, the appropriate scope of the duration inquiry is not limited to the day of his injury, but should instead consider the full breadth of the intended scope and duties of his employment").

## Polak's Claim of Seaman Status

Riverside argues that it is entitled to judgment as a matter of law on Polak's Jones Act and general maritime claims because the plaintiff was employed as a land-based worker rather than a seaman. (Def. Mem. at 6). However, this court finds that Polak has presented sufficient evidence to withstand summary judgment for Riverside on this basis.

With respect to the first prong of the test for seaman status, Riverside does not dispute that its vessels, including its crane barge, its materials barge and its push boats, were used to perform marine construction work, such as the dismantling, repair and

construction of docks, piers, floats and wharves. (See Pl. Ex. 2 at 14, 22; Pl. Ex. 3 at 1). It also does not seriously dispute that during his employment at Riverside, including at the time of his injury, Polak assisted in the accomplishment of the vessels' purpose – namely, the dismantling and rebuilding of docks and similar structures. For example, Polak has presented evidence showing that on the day of his injury, he was engaged in unloading sections of dismantled dock from the Brown project off of the materials barge using the crane from the crane barge. (PR ¶ 5; Pl. Ex. 7 at 158, 165; Def. Ex. D at 164). He has also presented evidence showing that over the course of his employment at Riverside, he worked on a number of marine construction projects that were accomplished using both the materials barge and the crane barge. (PR ¶ 4; Pl. Ex. 2 at 44-46; Pl. Ex. 7 at 135, 158, 233). Therefore, a reasonable jury could conclude that Polak's duties "contribute[d] to the function of the vessel or to the accomplishment of its mission." Wilander, 498 U.S. at 355, 111 S. Ct. at 817 (quotations and punctuation omitted). See also Grab, 506 Fed. Appx. at 275 (finding that ironworkers employed to construct bridge across Lake Pontchartrain satisfied first prong of the test for seaman status where they contributed to the mission of a derrick barge, which was the assembly of the Pontchartrain bridge).

Riverside focuses its argument on the second prong of the test for seaman status. It argues that Polak cannot satisfy the substantial connection requirement because he was a land-based worker whose responsibilities included general labor tasks such as shore side welding and fabrication, dismantling docks, clearing brush, loading and unloading

barges, and hauling junk to the landfill. (Def. Mem. at 12). It also argues that Polak, by

his own calculations, only spent about 2.7% of his time "substantially connected to a

vessel in transit," traveling back and forth to various job sites, which is far below the 30%

guideline needed to meet the temporal requirement of the substantial connection test."

(See id. at 13-14; Def. Reply Mem. (Docket No. 36) at 3). Riverside contends that to the

extent Polak spent any time aboard one of its vessels, "it was sporadic, infrequent and

incidental to his land-based duties[,]" and was therefore insufficient to support a Jones

Act claim. (Def. Mem. at 13). Again this court finds that these issues should be decided

by a jury.

To the extent Riverside contends that Polak's connection to its vessels could only

be considered substantial if the vessels were in transit at the time he was aboard, this

court finds that its argument is inconsistent with the Supreme Court's decision in

Chandris. Although in that case the Supreme Court acknowledged that "a maritime

employee must have a substantial employment-related connection to a vessel *in naviga-

tion*" in order to qualify as a seaman, it also explained that "[u]nder our precedent and the

law prevailing in the Circuits, it is generally accepted that 'a vessel does not cease to be a

vessel when she is not voyaging, but is at anchor, berthed, or at dockside[.]'" Chandris,

515 U.S. at 373, 115 S. Ct. at 2192 (quoting DiGiovanni v. Traylor Bros., Inc., 959 F.2d

1119, 1121 (1st Cir. 1992)). The Court further held that it was error for the trial court to

instruct the jury that it could not consider the period of time in which the vessel in

question was in drydock and out of navigation for purposes of determining whether the

plaintiff "performed a substantial part of his work on the vessel[.]" Id. at 372-73, 115 S.
Ct. at 2192. Instead, the Court found that the matter should have been determined by a
jury. Id. at 373, 115 S. Ct. at 2192.

Other courts, including the First Circuit, have found that an employee may be
considered a seaman for Jones Act purposes even when most or even all of the work
performed by the employee upon a vessel occurred while the vessel was moored or
otherwise stationary. See, e.g., Stewart v. Dutra Constr. Co., 418 F.3d 32, 34-36 (1st Cir.
2005) (finding that plaintiff, who was serving as an engineer on a stationary dredge in
Boston Harbor, was a seaman for Jones Act purposes); In re Endeavor Marine, Inc., 234
F.3d 287, 291-92 (5th Cir. 2000) (finding that district court incorrectly determined that
plaintiff, whose work aboard a barge was performed "only after the vessel was moored or
in the process of mooring" in the Mississippi River, was not a seaman merely because
"his duties [did] not literally carry him to sea"); Delange v. Dutra Constr. Co., 183 F.3d
916, 920 (9th Cir. 1999) (finding that a jury could reasonably conclude that plaintiff was
a seaman even though barge on which he performed work moved only four times during
his five-month employment with the defendant). Therefore, the question as to whether
Polak can meet the substantial connection test must focus not merely upon the period of
time during which he was in transit upon Riverside's vessels, but also on the nature and
duration of his work aboard the vessels when they were spudded and not moving.[5]

---

[5] To the extent Riverside argues that its barges should not be considered "vessels" under
the Jones Act, this court disagrees. A "'vessel' includes every description of watercraft or other

This court finds that a reasonable jury viewing the record in the light most favorable to Polak could find that throughout his employment with Riverside, the plaintiff had a connection to the defendant's vessels that was substantial both in terms of its nature and its duration. As described above, Polak has presented evidence indicating that the work he performed at Riverside required him to spend a significant portion of his time aboard the materials barge loading and unloading materials used or generated in connection with Riverside's marine construction projects. He has also presented evidence showing that at times he also would ride along with the crane, which operated from the crane barge, in order to transfer dismantled dock material from the work site to the materials barge. Additionally, Polak has testified that in connection with his marine construction work, he took part in guiding the materials barge from Riverside's work site to its shore side facility by operating the push boat or by standing aboard the materials barge and guiding the push boat operator through the water. A reasonable jury could conclude from this evidence that the nature of Polak's work involved a substantial connection to the defendants' fleet of vessels. See Delange, 183 F.3d at 920 ("A

artificial contrivance used, or capable of being used, as a means of transportation on water." Stewart, 418 F.3d at 34-35 (quoting 1 U.S.C. § 3). Accordingly, the Supreme Court has determined that watercraft that "serve[ ] a waterborne transportation function," and "carr[y] machinery, equipment, and crew over water" are vessels, whereas watercraft that have "been permanently moored or otherwise rendered practically incapable of transportation or movement" are not. Id. at 35 (quoting Stewart v. Dutra Constr. Co., 543 U.S. 481, 493, 125 S. Ct. 1118, 1126-27, 160 L. Ed. 2d 932 (2005)). As described above, it is undisputed that all of the watercraft involved in this case, including Riverside's barges, were used and were capable of being used to carry men, machinery and equipment over water. Therefore, they must be considered "vessels" for purposes of Polak's Jones Act and general maritime claims.

maritime worker's connection to [a] vessel in navigation is substantial if his duties are inherently vessel-related and thus 'take him to sea.'" (quoting <u>Papai</u>, 520 U.S. at 555, 117 S. Ct. 1535)). Therefore, it supports Polak's claim that he was employed at Riverside as a seaman.

The record also contains sufficient evidence to support Polak's claim that his employment-related connection to Riverside's vessels was substantial in duration. The record shows that out of the 772 hand recorded hours Polak worked for Riverside during the time period between August 27, 2009 and January 29, 2010, 84.7% of that time was devoted to "On Site" work, which included marine construction work such as the 120 hours of work that Polak performed on site at the Brown project. (Def. Ex. F; Pl. Ex. 4). It also shows that Polak spent nearly 3% of those hours traveling to or from a job site on one of Riverside's vessels, and approximately 12% of his time performing "Yard" duties at Riverside's facility, which included work that he performed aboard one of the defendant's barges. (Def. Ex. F; Pl. Ex. 7 at 233). Although the precise amount of time that Polak spent working aboard the defendant's vessels rather than on land remains unclear from Polak's time sheets, the Supreme Court has indicated that courts should refrain from granting summary judgment to an employer unless the "undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation[.]" <u>Chandris</u>, 515 U.S. at 371, 115 S. Ct. at 2191. Given Polak's description of the type of work that he performed while employed at Riverside, which required his repeated presence upon the materials barge and use of the crane barge, and included responsibility

for moving the materials barge from Riverside's job sites to its facility, this court

concludes that there is an evidentiary basis upon which a factfinder could conclude that

Polak performed at least 30% of his work upon the defendant's vessels, and that his

temporal connection to those vessels was substantial.

To the extent Riverside suggests that the plaintiff's welding work on the

defendant's new push boat must be included in the calculation of Polak's land-based

versus sea-based time as a matter of law, this court disagrees. It is undisputed that Polak

performed that work at night, after the ordinary work day was over, and that Riverside

paid him in cash for that work and did not record it on the company's books. (Def. Ex. D

at 217-19). Therefore, the plaintiff has raised a question of fact as to whether the

evidence of his welding work should be considered as part of his duties for purposes of

determining whether or not he can be considered a seaman under the Jones Act and

general maritime law.

This court also finds that the fact that Polak was hired as a "laborer," and was not

specifically assigned to work on a vessel does not defeat his claim of seaman status. "[I]t

is not the employee's particular job that is determinative [of seaman status], but the

employee's connection to a vessel." Chandris, 515 U.S. at 364, 115 S. Ct. at 2188

(quotations, punctuation and citations omitted). See also In re Endeavor, 234 F.3d at 291

("even a ship repairman (which is traditional longshoreman work and is one of the

enumerated occupations under the LHWCA) may qualify for seaman status if he has the

requisite employment-related connection to the vessel"); Delange, 183 F.3d at 918, 920

(finding that plaintiff had raised disputed issues of material fact as to whether he qualified

for seaman status under the Jones Act even though he was hired as a carpenter, and "[h]is

actual duties included mechanical work, welding, carpentry, supply runs, and

occasionally pile driving").  Nor is it dispositive that Polak returned home at the end of

every workday, or that he carried out land-based work such as land-based construction,

trips to the landfill, clearing brush, and light duty painting and cleaning work in

Riverside's shore side office.  See Chandris, 515 U.S. at 363-64, 15 S. Ct. at 2187-88

(explaining that an employee need not work exclusively on board a vessel to qualify as a

Jones Act seaman, and that remedies under the Act may be available to employees who

perform a portion of their work on shore); Grab, 506 Fed. Appx. at 276 ("the fact that

[plaintiff] returned home daily did not remove him from his exposure to cognizable

dangers of the sea"); Grab v. Traylor Bros., Inc., 796 F. Supp. 2d 788, 793 (E.D. La.

2011) (holding that plaintiff qualified for seaman status although a portion of his duties

were performed on a bridge structure rather than a vessel).  The question as to whether

the requirements of seaman status have been satisfied in this case must be evaluated in

light of "the total circumstances" of Polak's employment with Riverside.  See Chandris,

515 U.S. at 370, 115 S. Ct. at 2190 (quotations and citation omitted).  Because the

plaintiff has raised genuine issues of fact as to whether, under all the circumstances, his

duties contributed to the mission of Riverside's vessels and his employment-related

connection to those vessels was substantial in terms of both its duration and its nature,

this court recommends that the issue of Polak's seaman status be submitted to the jury in

the event the court determines that res judicata does not apply and that it is necessary to reach this issue.

### C. Count IV: Polak's Claim Under the LHWCA

In addition to his claims under the Jones Act and general maritime law, Polak has asserted a claim against Riverside for violation of section 905(b) of the LHWCA, 33 U.S.C. § 905(b). Riverside argues that Polak has no cognizable claim under § 905(b) because no vessel was involved in the incident that resulted in the plaintiff's alleged injury, and there is no evidence that the defendant was operating in its capacity as a vessel owner, as opposed to a shore side employer, at the time of the alleged injury. (Def. Mem. at 15-16; Def. Reply Mem. at 6). For the reasons that follow, this court agrees that the undisputed facts do not support Polak's claim under the LHWCA. Accordingly, this court recommends that summary judgment be entered in favor of Riverside on this claim.

"The LHWCA establishes a comprehensive federal worker's compensation scheme which holds employers liable, irrespective of fault, for securing the payment of the prescribed compensation to qualified maritime employees injured in the course of their employment." Morehead v. Atkinson-Kiewit, J/V, 97 F.3d 603, 607 (1st Cir. 1996) (citing 33 U.S.C. § 904). Such liability "is termed 'exclusive and in place of all other liability of such employer to the employee.'" Id. (quoting 33 U.S.C. § 905(a)). However, "Section 905(b) of the Act authorizes certain covered employees to bring an action

against the vessel as a third party if their employment injury was caused by the negligence of the vessel." Id. Specifically, section 905(b) provides:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C. § 905(b).

Where, as here, the employer and the vessel owner are one and the same, the claimant may sue the employer for negligence under § 905(b), but only in its capacity as the owner of the vessel. See Morehead, 97 F.3d at 605 ("In its capacity as [plaintiff's] employer, [defendant] is immune from tort actions brought by covered employees like [plaintiff]. But as the bare boat charterer of the barge on which [plaintiff] was injured, [defendant] is deemed also to be the statutory vessel owner"); Dean, 771 F. Supp. at 475

("where the employer is also the vessel owner, the claimant may sue the employer in its capacity as the vessel owner"). Therefore, in order to prevail on its claim against Riverside under § 905(b), Polak "has to show that any negligence on [Riverside's] part is attributable to it as vessel rather than as [Polak's] insured LHWCA employer." Morehead, 97 F.3d at 608.

The defendant argues that Polak cannot prevail on his claim under the LHWCA because, at the time of Polak's injury, both the plaintiff and Anderson were engaged in the traditional work of a stevedore or longshoreman, which had nothing to do with Riverside's role as the owner of a vessel. (Def. Mem. at 15-16). Under section 905(b), "a vessel owner acting as its own stevedore is liable only for negligence in its 'owner' capacity, not for negligence in its 'stevedore' [the insured employer] capacity." Morehead, 97 F.3d at 610 (quoting Jones v. Laughlin, 462 U.S. 523, 531 n.6, 103 S. Ct. 2541, 2547 n.6, 76 L. Ed. 2d 768 (1983)). The evidence presented by Polak shows that at the time of the alleged injury, Anderson was on a pier using a Bobcat forklift to move pilings so that the pilings could then be loaded onto Riverside's materials barge. (See Pl. Ex. 7 at 171-72; DF ¶ 6; PR ¶ 6; Pl. Ex. 5). As Riverside argues, such activity is consistent with the duties of a stevedore or longshoreman. See Jones, 462 U.S. at 528, 103 S. Ct. at 2546 (describing longshoremen, most of whom "are employed by independent stevedores," as responsible for loading and unloading ships). In any event, this court finds that no matter how Anderson's activities are characterized, Polak has presented insufficient evidence to support a claim under the LHWCA.

"The sine qua non of § 905(b) statutory liability for vessel negligence is the presence of a vessel which admiralty regards as a separate entity distinct from its owner." Richendollar v. Diamond M Drilling Co., Inc., 819 F.2d 124, 128 (5th Cir. 1987) (quotations and alteration omitted). Therefore, "[i]n order to hold the vessel owner liable, there must be some condition of the vessel that caused or contributed to the plaintiff's injury." Dean, 771 F. Supp. at 476. See also Kathriner v. UNISEA, Inc., 975 F.2d 657, 663 (9th Cir. 1992) (affirming district court's decision to deny plaintiff's motion to amend in order to state a claim under § 905(b) of the LHWCA where structure on which plaintiff was injured was not a vessel as a matter of law); Brown v. McKinnon Bridge Co., Inc., 732 F. Supp. 1479, 1485 (E.D. Tenn. 1989) (finding that plaintiff's "injury was not 'caused by the negligence of a vessel,' 33 U.S.C. § 905(b), because the injury he suffered was wholly unrelated to any negligent condition on a barge"). Because there is no dispute that both Polak and Anderson were on the pier at the time of Polak's injury, and that none of Riverside's vessels caused or contributed to cause the piling to land on Polak's foot, this court finds that the record does not support a claim under the LHWCA, and that Riverside is entitled to summary judgment with respect to Count IV of the complaint.

## IV.  CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the "Defendant's Motion for Summary Judgment" (Docket No. 13) be ALLOWED.[6]

>     / s / Judith Gail Dein
> Judith Gail Dein
> United States Magistrate Judge

---

[6] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).